(Slip Opinion) OCTOBER TERM, 2010 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JANUS CAPITAL GROUP, INC., ET AL. *v.* FIRST DERIVATIVE TRADERS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 09–525.   Argued December 7, 2010—Decided June 13, 2011

Respondent First Derivative Traders (First Derivative), representing a class of stockholders in petitioner Janus Capital Group, Inc. (JCG), filed this private action under Securities and Exchange Commission (SEC) Rule 10b–5, which forbids "any person . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities.  The complaint alleged, *inter alia,* that JCG and its wholly owned subsidiary, petitioner Janus Capital Management LLC (JCM), made false statements in mutual fund prospectuses filed by Janus Investment Fund—for which JCM was the investment adviser and administrator—and that those statements affected the price of JCG's stock.  Although JCG created Janus Investment Fund, it is a separate legal entity owned entirely by mutual fund investors.  The District Court dismissed the complaint for failure to state a claim. The Fourth Circuit reversed, holding that First Derivative had sufficiently alleged that JCG and JCM, by participating in the writing and dissemination of the prospectuses, made the misleading statements contained in the documents.  Before this Court, First Derivative continues to argue that JCM made the statements but seeks to hold JCG liable only as a control person of JCM under §20(a).

*Held:* Because the false statements included in the prospectuses were made by Janus Investment Fund, not by JCM, JCM and JCG cannot be held liable in a private action under Rule 10b–5.  Pp. 5–12.

   (a) Although neither Rule 10b–5 nor the statute it interprets, §10(b) of the Act, expressly creates a private right of action, such an "action is implied under §10(b)."  *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.*, 404 U. S. 6, 13, n. 9.  That holding "remains the law," *Stoneridge Investment Partners, LLC* v. *Scientific-*

*Atlanta, Inc.*, 552 U. S. 148, 165, but, in analyzing the question at issue, the Court is mindful that it must give "narrow dimensions . . . to a right . . . Congress did not authorize when it first enacted the statute and did not expand when it revisited" it, *id.,* at 167.  Pp. 5–10.

(1) For Rule 10b–5 purposes, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  This rule follows from *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 180, which held that Rule 10b–5's private right of action does not include suits against aiders and abettors who contribute "substantial assistance" to the making of a statement but do not actually make it.  Reading "make" more broadly, to include persons or entities lacking ultimate control over a statement, would substantially undermine *Central Bank* by rendering aiders and abettors almost nonexistent.  The Court's interpretation is also suggested by *Stoneridge,* 552 U. S., at 161, and accords with the narrow scope that must be given the implied private right of action, *id.,* at 167.  Pp. 6–8.

(2) The Court rejects the Government's contention that "make" should be defined as "create," thereby allowing private plaintiffs to sue a person who provides the false or misleading information that another person puts into a statement.  Adopting that definition would be inconsistent with *Stoneridge, supra*, at 161, which rejected a private Rule 10b–5 suit against companies involved in deceptive transactions, even when information about those transactions was later incorporated into false public statements.  First Derivative notes the uniquely close relationship between a mutual fund and its investment adviser, but the corporate formalities were observed, and reapportionment of liability in light of this close relationship is properly the responsibility of Congress, not the courts.  Furthermore, First Derivative's rule would read into Rule 10b–5 a theory of liability similar to—but broader than—control-person liability under §20(a).  Pp. 8–10.

(b) Although JCM may have been significantly involved in preparing the prospectuses, it did not itself "make" the statements at issue for Rule 10b–5 purposes.  Its assistance in crafting what was said was subject to Janus Investment Fund's ultimate control.  Pp. 10–12.

566 F. 3d 111, reversed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and ALITO, JJ., joined.  BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 09–525

---

## JANUS CAPITAL GROUP, INC., ET AL., PETITIONERS *v.* FIRST DERIVATIVE TRADERS

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 13, 2011]

JUSTICE THOMAS delivered the opinion of the Court.

This case requires us to determine whether Janus Capital Management LLC (JCM), a mutual fund investment adviser, can be held liable in a private action under Securities and Exchange Commission (SEC) Rule 10b–5 for false statements included in its client mutual funds' prospectuses.  Rule 10b–5 prohibits "mak[ing] any untrue statement of a material fact" in connection with the purchase or sale of securities.  17 CFR §240.10b–5 (2010).  We conclude that JCM cannot be held liable because it did not make the statements in the prospectuses.

I

Janus Capital Group, Inc. (JCG), is a publicly traded company that created the Janus family of mutual funds.  These mutual funds are organized in a Massachusetts business trust, the Janus Investment Fund.  Janus Investment Fund retained JCG's wholly owned subsidiary, JCM, to be its investment adviser and administrator.  JCG and JCM are the petitioners here.

Although JCG created Janus Investment Fund, Janus Investment Fund is a separate legal entity owned entirely

by mutual fund investors. Janus Investment Fund has no
assets apart from those owned by the investors. JCM
provides Janus Investment Fund with investment advi-
sory services, which include "the management and admin-
istrative services necessary for the operation of [Janus]
Fun[d]," App. 225a, but the two entities maintain legal
independence. At all times relevant to this case, all of
the officers of Janus Investment Fund were also officers of
JCM, but only one member of Janus Investment Fund's
board of trustees was associated with JCM. This is more
independence than is required: By statute, up to 60 per-
cent of the board of a mutual fund may be composed of
"interested persons." See 54 Stat. 806, as amended, 15
U. S. C. §80a–10(a); see also 15 U. S. C. A. §80a–2(a)(19)
(2009 ed. and Feb. 2011 Supp.) (defining "interested
person").

As the securities laws require, Janus Investment Fund
issued prospectuses describing the investment strategy
and operations of its mutual funds to investors. See 15
U. S. C. §§77b(a)(10), 77e(b)(2), 80a–8(b), 80a–2(a)(31),
80a–29(a)–(b). The prospectuses for several funds repre-
sented that the funds were not suitable for market timing
and can be read to suggest that JCM would implement
policies to curb the practice.[1] For example, the Janus

_____

[1] Market timing is a trading strategy that exploits time delay in mu-
tual funds' daily valuation system. The price for buying or selling
shares of a mutual fund is ordinarily determined by the next net asset
value (NAV) calculation after the order is placed. The NAV calculation
usually happens once a day, at the close of the major U. S. markets.
Because of certain time delays, however, the values used in these
calculations do not always accurately reflect the true value of the
underlying assets. For example, a fund may value its foreign securities
based on the price at the close of the foreign market, which may have
occurred several hours before the calculation. But events might have
taken place after the close of the foreign market that could be expected
to affect their price. If the event were expected to increase the price of
the foreign securities, a market-timing investor could buy shares of a

Mercury Fund prospectus dated February 25, 2002, stated that the fund was "not intended for market timing or excessive trading" and represented that it "may reject any purchase request . . . if it believes that any combination of trading activity is attributable to market timing or is otherwise excessive or potentially disruptive to the Fund." App. 141a. Although market timing is legal, it harms other investors in the mutual fund.

In September 2003, the Attorney General of the State of New York filed a complaint against JCG and JCM alleging that JCG entered into secret arrangements to permit market timing in several funds run by JCM. After the complaint's allegations became public, investors withdrew significant amounts of money from the Janus Investment Fund mutual funds.[2] Because Janus Investment Fund compensated JCM based on the total value of the funds and JCM's management fees comprised a significant percentage of JCG's income, Janus Investment Fund's loss of value affected JCG's value as well. JCG's stock price fell nearly 25 percent, from $17.68 on September 2 to $13.50 on September 26.

Respondent First Derivative Traders (First Derivative) represents a class of plaintiffs who owned JCG stock as of September 3, 2003. Its complaint asserts claims against JCG and JCM for violations of Rule 10b–5 and §10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 15 U. S. C. §78j(b). First Derivative alleges that JCG and JCM "caused mutual fund prospectuses to be issued for Janus mutual funds and made them available to

_____

mutual fund at the artificially low NAV and sell the next day when the NAV corrects itself upward. See Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70402 (proposed Dec. 17, 2003).

[2] In 2004, JCG and JCM settled these allegations and agreed to reduce their fees by $125 million and pay $50 million in civil penalties and $50 million in disgorgement to the mutual fund investors.

the investing public, which created the misleading impres-sion that [JCG and JCM] would implement measures to curb market timing in the Janus [mutual funds]."  App. to Pet. for Cert. 60a.  "Had the truth been known, Janus [mutual funds] would have been less attractive to inves-tors, and consequently, [JCG] would have realized lower revenues, so [JCG's] stock would have traded at lower prices."  *Id.*, at 72a.

First Derivative contends that JCG and JCM "materi-ally misled the investing public" and that class members relied "upon the integrity of the market price of [JCG] securities and market information relating to [JCG and JCM]."  *Id.*, at 109a.  The complaint also alleges that JCG should be held liable for the acts of JCM as a "controlling person" under 15 U. S. C. A. §78t(a) (Feb. 2011 Supp.) (§20(a) of the Act).

The District Court dismissed the complaint for failure to state a claim.[3]  *In re Mutual Funds Inv. Litigation*, 487 F. Supp. 2d 618, 620 (D Md. 2007).  The Court of Appeals for the Fourth Circuit reversed, holding that First Deriva-tive had sufficiently alleged that "JCG and JCM, by par-ticipating in the writing and dissemination of the prospec-tuses, *made* the misleading statements contained in the documents."  *In re Mutual Funds Inv. Litigation*, 566 F. 3d 111, 121 (2009) (emphasis in original).  With respect to the element of reliance, the court found that investors would infer that JCM "played a role in preparing or approving the content of the Janus fund prospectuses," *id.*, at 127, but that investors would not infer the same about JCG,

---

[3] The elements of a private action under Rule 10b–5 are "(1) a mate-rial misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the pur-chase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Invest-ment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U. S. 148, 157 (2008).

which could be liable only as a "control person" of JCM under §20(a). *Id.*, at 128, 129–130.

## II

We granted certiorari to address whether JCM can be held liable in a private action under Rule 10b–5 for false statements included in Janus Investment Fund's prospectuses. 561 U. S. \_\_\_ (2010). Under Rule 10b–5, it is unlawful for "any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 CFR §240.10b–5(b).[4] To be liable, therefore, JCM must have "made" the material misstatements in the prospectuses. We hold that it did not.[5]

### A

The SEC promulgated Rule 10b–5 pursuant to authority granted under §10(b) of the Securities Exchange Act of 1934, 15 U. S. C. §78j(b). Although neither Rule 10b–5 nor §10(b) expressly creates a private right of action, this Court has held that "a private right of action is implied under §10(b)." *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.*, 404 U. S. 6, 13, n. 9 (1971). That holding "remains the law," *Stoneridge Investment Part-*

---

[4] Rule 10b–5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 CFR §240.10b–5(b).

[5] Although First Derivative argued below that JCG violated Rule 10b–5 by making the statements in the prospectuses, it now seeks to hold JCG liable solely as a control person of JCM under §20(a). The only question we must answer, therefore, is whether JCM made the misstatements. Whether First Derivative has stated a claim against JCG as a control person depends on whether it has stated a claim against JCM.

*ners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U. S. 148, 165
(2008), but "[c]oncerns with the judicial creation of a pri-
vate cause of action caution against its expansion," *ibid.*
Thus, in analyzing whether JCM "made" the statements
for purposes of Rule 10b–5, we are mindful that we must
give "narrow dimensions . . . to a right of action Congress
did not authorize when it first enacted the statute and did
not expand when it revisited the law." *Id.,* at 167.

1

One "makes" a statement by stating it. When "make" is
paired with a noun expressing the action of a verb, the
resulting phrase is "approximately equivalent in sense" to
that verb. 6 Oxford English Dictionary 66 (def. 59) (1933)
(hereinafter OED); accord, Webster's New International
Dictionary 1485 (def. 43) (2d ed. 1934) ("*Make* followed by
a noun with the indefinite article is often nearly equiva-
lent to the verb intransitive corresponding to that noun").
For instance, "to make a proclamation" is the approximate
equivalent of "to proclaim," and "to make a promise" ap-
proximates "to promise." See 6 OED 66 (def. 59). The
phrase at issue in Rule 10b–5, "[t]o make any . . . state-
ment," is thus the approximate equivalent of "to state."

For purposes of Rule 10b–5, the maker of a statement is
the person or entity with ultimate authority over the
statement, including its content and whether and how to
communicate it. Without control, a person or entity can
merely suggest what to say, not "make" a statement in its
own right. One who prepares or publishes a statement on
behalf of another is not its maker. And in the ordinary
case, attribution within a statement or implicit from sur-
rounding circumstances is strong evidence that a state-
ment was made by—and only by—the party to whom it is
attributed. This rule might best be exemplified by the
relationship between a speechwriter and a speaker. Even
when a speechwriter drafts a speech, the content is en-

tirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

This rule follows from *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994), in which we held that Rule 10b–5's private right of action does not include suits against aiders and abettors. See *id.*, at 180. Such suits—against entities that contribute "substantial assistance" to the making of a statement but do not actually make it—may be brought by the SEC, see 15 U. S. C. A. §78t(e), but not by private parties. A broader reading of "make," including persons or entities without ultimate control over the content of a statement, would substantially undermine *Central Bank*. If persons or entities without control over the content of a statement could be considered primary violators who "made" the statement, then aiders and abettors would be almost nonexistent.[6]

This interpretation is further supported by our recent decision in *Stoneridge*. There, investors sued "entities who, acting both as customers and suppliers, agreed to arrangements that allowed the investors' company to mislead its auditor and issue a misleading financial statement." 552 U. S., at 152–153. We held that dismissal of the complaint was proper because the public

—————

[6] The dissent correctly notes that *Central Bank* involved secondary, not primary, liability. *Post*, at 4 (opinion of BREYER, J.). But for *Central Bank* to have any meaning, there must be some distinction between those who are primarily liable (and thus may be pursued in private suits) and those who are secondarily liable (and thus may not be pursued in private suits).

We draw a clean line between the two—the maker is the person or entity with ultimate authority over a statement and others are not. In contrast, the dissent's only limit on primary liability is not much of a limit at all. It would allow for primary liability whenever "[t]he specific relationships alleged . . . warrant [that] conclusion"—whatever that may mean. *Post*, at 11.

could not have relied on the entities' undisclosed deceptive acts. *Id.*, at 166–167. Significantly, in reaching that conclusion we emphasized that "nothing [the defendants] did made it necessary or inevitable for [the company] to record the transactions as it did." *Id.*, at 161.[7] This emphasis suggests the rule we adopt today: that the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it. Without such authority, it is not "necessary or inevitable" that any falsehood will be contained in the statement.

Our holding also accords with the narrow scope that we must give the implied private right of action. *Id.,* at 167. Although the existence of the private right is now settled, we will not expand liability beyond the person or entity that ultimately has authority over a false statement.

2

The Government contends that "make" should be defined as "create." Brief for United States as *Amicus Curiae* 14–15 (citing Webster's New International Dictionary 1485 (2d ed. 1958) (defining "make" as "[t]o cause to exist, appear, or occur")). This definition, although perhaps appropriate when "make" is directed at an object unassociated with a verb (*e.g.*, "to make a chair"), fails to capture its meaning when directed at an object expressing the action of a verb.

Adopting the Government's definition of "make" would also lead to results inconsistent with our precedent. The Government's definition would permit private plaintiffs to sue a person who "provides the false or misleading information that another person then puts into the statement."

_____

[7] We agree that "no one in *Stoneridge* contended that the equipment suppliers were, in fact, the *makers* of the cable company's misstatements." *Post*, at 8. If *Stoneridge* had addressed whether the equipment suppliers were "makers," today's decision would be unnecessary. The point is that *Stoneridge*'s analysis suggests that they were not.

Brief for United States as *Amicus Curiae* 13.[8]   But in *Stoneridge*, we rejected a private Rule 10b–5 suit against companies involved in deceptive transactions, even when information about those transactions was later incorporated into false public statements. 552 U. S., at 161. We see no reason to treat participating in the drafting of a false statement differently from engaging in deceptive transactions, when each is merely an undisclosed act preceding the decision of an independent entity to make a public statement.

For its part, First Derivative suggests that the "well-recognized and uniquely close relationship between a mutual fund and its investment adviser" should inform our decision. Brief for Respondent 21. It suggests that an investment adviser should generally be understood to be the "maker" of statements by its client mutual fund, like a playwright whose lines are delivered by an actor. We decline this invitation to disregard the corporate form. Although First Derivative and its *amici* persuasively argue that investment advisers exercise significant influ-

————————

[8] Because we do not find the meaning of "make" in Rule 10b–5 to be ambiguous, we need not consider the Government's assertion that we should defer to the SEC's interpretation of the word elsewhere. Brief for United States as *Amicus Curiae* 13 (citing Brief for SEC as *Amicus Curiae* in *Pacific Inv. Mgmt. Co. LLC* v. *Mayer Brown LLP*, No. 09–1619 (CA2), p. 7); see *Christensen* v. *Harris County*, 529 U. S. 576, 588 (2000). We note, however, that we have previously expressed skepticism over the degree to which the SEC should receive deference regarding the private right of action. See *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 41, n. 27 (1977) (noting that the SEC's presumed expertise "is of limited value" when analyzing "whether a cause of action should be implied by judicial interpretation in favor of a particular class of litigants"). This also is not the first time this Court has disagreed with the SEC's broad view of §10(b) or Rule 10b–5. See, *e.g.*, *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 188–191 (1994); *Dirks* v. *SEC*, 463 U. S. 646, 666, n. 27 (1983); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 207 (1976); *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 746, n. 10 (1975).

ence over their client funds, see *Jones* v. *Harris Associates L. P.*, 559 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 1–2), it is undisputed that the corporate formalities were observed here. JCM and Janus Investment Fund remain legally separate entities, and Janus Investment Fund's board of trustees was more independent than the statute requires. 15 U. S. C. §80a–10.[9] Any reapportionment of liability in the securities industry in light of the close relationship between investment advisers and mutual funds is properly the responsibility of Congress and not the courts. Moreover, just as with the Government's theory, First Derivative's rule would create the broad liability that we rejected in *Stoneridge.*

Congress also has established liability in §20(a) for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws. 15 U. S. C. A. §78t(a). First Derivative's theory of liability based on a relationship of influence resembles the liability imposed by Congress for control. To adopt First Derivative's theory would read into Rule 10b–5 a theory of liability similar to—but broader in application than, see *post*, at 9—what Congress has already created expressly elsewhere.[10] We decline to do so.

## B

Under this rule, JCM did not "make" any of the state-

---

[9] Nor does First Derivative contend that any statements made by JCM to Janus Investment Fund were "public statements" for the purposes of *Basic Inc.* v. *Levinson*, 485 U. S. 224, 227–228 (1988). We do not address whether and in what circumstances statements would qualify as "public." Cf. *post*, at 12–13 (citing cases involving liability for statements made to analysts); *In re Aetna, Inc. Securities Litigation*, 617 F. 3d 272, 275–277 (CA3 2010) (involving allegations that defendants "publicly tout[ed]" falsities on analyst conference calls).

[10] We do not address whether Congress created liability for entities that act through innocent intermediaries in 15 U. S. C. A. §78t(b). See Tr. of Oral Arg. 6, 61.

ments in the Janus Investment Fund prospectuses; Janus Investment Fund did. Only Janus Investment Fund—not JCM—bears the statutory obligation to file the prospectuses with the SEC. 15 U. S. C. §§77e(b)(2), 80a–8(b), 80a–29(a)–(b); see also 17 CFR §230.497 (imposing requirements on "investment companies"). The SEC has recorded that Janus Investment Fund filed the prospectuses. See JIF Group1 Standalone Prospectuses (Feb. 25, 2002), online at http://www.sec.gov/Archives/edgar/data/ 277751/000027775102000049/0000277751-02-000049.txt (as visited June 10, 2011, and available in Clerk of Court's case file) (recording the "Filer" of the Janus Mercury Fund prospectus as "Janus Investment Fund"). There is no allegation that JCM in fact filed the prospectuses and falsely attributed them to Janus Investment Fund. Nor did anything on the face of the prospectuses indicate that any statements therein came from JCM rather than Janus Investment Fund—a legally independent entity with its own board of trustees.[11]

————————

[11] First Derivative suggests that "indirectly" in Rule 10b–5 may broaden the meaning of "make." We disagree. The phrase "directly or indirectly" is set off by itself in Rule 10b–5 and modifies not just "to make," but also "to employ" and "to engage." We think the phrase merely clarifies that as long as a statement is made, it does not matter whether the statement was communicated directly or indirectly to the recipient. A different understanding of "indirectly" would, like a broad definition of "make," threaten to erase the line between primary violators and aiders and abettors established by *Central Bank.*

In this case, we need not define precisely what it means to communicate a "made" statement indirectly because none of the statements in the prospectuses were attributed, explicitly or implicitly, to JCM. Without attribution, there is no indication that Janus Investment Fund was quoting or otherwise repeating a statement originally "made" by JCM. Cf. *Anixter* v. *Home-Stake Production Co.*, 77 F. 3d 1215, 1220, and n. 4 (CA10 1996) (quoting a signed "'Auditor's Report'" included in a prospectus); *Basic*, *supra*, at 227, n. 4 (quoting a news item reporting a statement by Basic's president). More may be required to find that a person or entity made a statement indirectly, but attribution is necessary.

First Derivative suggests that both JCM and Janus Investment Fund might have "made" the misleading statements within the meaning of Rule 10b–5 because JCM was significantly involved in preparing the prospectuses. But this assistance, subject to the ultimate control of Janus Investment Fund, does not mean that JCM "made" any statements in the prospectuses. Although JCM, like a speechwriter, may have assisted Janus Investment Fund with crafting what Janus Investment Fund said in the prospectuses, JCM itself did not "make" those statements for purposes of Rule 10b–5.[12]

\*    \*    \*

The statements in the Janus Investment Fund prospectuses were made by Janus Investment Fund, not by JCM. Accordingly, First Derivative has not stated a claim against JCM under Rule 10b–5. The judgment of the United States Court of Appeals for the Fourth Circuit is reversed.

*It is so ordered.*

———————

[12] That JCM provided access to Janus Investment Fund's prospectuses on its Web site is also not a basis for liability. Merely hosting a document on a Web site does not indicate that the hosting entity adopts the document as its own statement or exercises control over its content. Cf. *United States* v. *Ware*, 577 F. 3d 442, 448 (CA2 2009) (involving the issuance of false press releases through innocent companies). In doing so, we do not think JCM made any of the statements in Janus Investment Fund's prospectuses for purposes of Rule 10b–5 liability, just as we do not think that the SEC "makes" the statements in the many prospectuses available on its Web site.

# SUPREME COURT OF THE UNITED STATES

No. 09–525

JANUS CAPITAL GROUP, INC., ET AL., PETITIONERS
*v.* FIRST DERIVATIVE TRADERS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 13, 2011]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

This case involves a private Securities and Exchange Commission (SEC) Rule 10b–5 action brought by a group of investors against Janus Capital Group, Inc., and Janus Capital Management LLC (Janus Management), a firm that acted as an investment adviser to a family of mutual funds (collectively, the Janus Fund or Fund). The investors claim that Janus Management knowingly made materially false or misleading statements that appeared in prospectuses issued by the Janus Fund. They say that they relied upon those statements, and that they suffered resulting economic harm.

Janus Management and the Janus Fund are closely related. Each of the Fund's officers is a Janus Management employee. Janus Management, acting through those employees (and other of its employees), manages the purchase, sale, redemption, and distribution of the Fund's investments. Janus Management prepares, modifies, and implements the Janus Fund's long-term strategies. And Janus Management, acting through those employees, carries out the Fund's daily activities.

Rule 10b–5 says in relevant part that it is unlawful for "any person, directly or indirectly . . . *[t]o make* any untrue statement of a material fact" in connection with the pur-

chase or sale of securities.  17 CFR §240.10b–5(b) (2010)
(emphasis added).  See also 15 U. S. C. §78j(b) (§10(b) of
the Securities Exchange Act of 1934).  The specific legal
question before us is whether Janus Management can be
held responsible under the Rule for having "ma[d]e" cer-
tain false statements about the Janus Fund's activities.
The statements in question appear in the Janus Fund's
prospectuses.

The Court holds that only the Janus Fund, not Janus
Management, could have "ma[d]e" those statements.  The
majority points out that the Janus Fund's board of trus-
tees has "ultimate authority" over the content of the
statements in a Fund prospectus.  And in the majority's
view, only "the person or entity with ultimate authority
over the statement, including its content and whether and
how to communicate it" can "make" a statement within the
terms of Rule 10b–5.  *Ante*, at 6.

In my view, however, the majority has incorrectly inter-
preted the Rule's word "make."  Neither common English
nor this Court's earlier cases limit the scope of that
word to those with "ultimate authority" over a statement's
content.  To the contrary, both language and case law
indicate that, depending upon the circumstances, a man-
agement company, a board of trustees, individual company
officers, or others, separately or together, might "make"
statements contained in a firm's prospectus—even if a
board of directors has ultimate content-related responsi-
bility.  And the circumstances here are such that a court
could find that Janus Management made the statements
in question.

I

Respondent's complaint sets forth the basic elements
of a typical Rule 10b–5 "fraud on the market" claim.  It
alleges that Janus Management made statements that
"created the misleading impression that" it "would

implement measures to curb" a trading strategy called "market timing." Second Amended Complaint ¶6 (hereinafter Complaint), App. to Pet. for Cert. 60a. The complaint adds that Janus Management knew that these "market timing" statements were false; that the statements were material; that the market, in pricing securities (including related securities) relied upon the statements; that as a result, when the truth came out (that Janus Management indeed permitted "market timing" in the Janus Fund), the price of relevant shares fell; and the false statements thereby caused respondent significant economic losses. Complaint ¶¶4–10, *id.*, at 60a–63a. Cf. *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U. S. 148, 157 (2008) (identifying the elements of "a typical §10(b) private action").

The majority finds the complaint fatally flawed, however, because (1) Rule 10b–5 says that no "person" shall "directly or indirectly . . . *make* any untrue statement of a material fact," (2) the statements at issue appeared in the *Janus Fund's* prospectuses, and (3) only "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it" can "make" a false statement. *Ante*, at 2–3, 5–6.

But where can the majority find legal support for the rule that it enunciates? The English language does not impose upon the word "make" boundaries of the kind the majority finds determinative. Every day, hosts of corporate officials make statements with content that more senior officials or the board of directors have "ultimate authority" to control. So do cabinet officials make statements about matters that the Constitution places within the ultimate authority of the President. So do thousands, perhaps millions, of other employees make statements that, as to content, form, or timing, are subject to the control of another.

Nothing in the English language prevents one from

saying that several different individuals, separately or together, "make" a statement that each has a hand in producing. For example, as a matter of English, one can say that a national political party has made a statement even if the only written communication consists of uniform press releases issued in the name of local party branches; one can say that one foreign nation has made a statement even when the officials of a different nation (subject to its influence) speak about the matter; and one can say that the President has made a statement even if his press officer issues a communication, sometimes in the press officer's own name. Practical matters related to context, including control, participation, and relevant audience, help determine who "makes" a statement and to whom that statement may properly be "attributed," see *ante*, at 11, n. 11—at least as far as ordinary English is concerned.

Neither can the majority find support in any relevant precedent. The majority says that its rule "follows from *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164 (1994)," in which the Court "held that Rule 10b–5's private right of action does not include suits against aiders and abettors." *Ante*, at 7. But *Central Bank* concerns a different matter. And it no more requires the majority's rule than free air travel for small children requires free air travel for adults.

*Central Bank* is a case about *secondary* liability, liability attaching, not to an individual making a false statement, but to an individual helping *someone else* do so. *Central Bank* involved a bond issuer accused of having made materially false statements, which overstated the values of property that backed the bonds. *Central Bank* also involved a defendant that was a bank, serving as indenture trustee, which was supposed to check the bond issuer's valuations. The plaintiffs claimed that the bank delayed its valuation checks and thereby *helped* the issuer make its false statements credible. The question before

the Court concerned the bank's liability—a *secondary* liability for "aiding and abetting" the bond issuer, who (on the theory set forth) was primarily liable.

The Court made this clear. The question presented was "whether private civil liability under §10(b) extends . . . to those *who do not engage in the manipulative or deceptive practice*, but who aid and abet the violation." 511 U. S., at 167 (emphasis added). The Court wrote that "aiding and abetting liability reaches persons *who do not engage in the proscribed activities at all*, but who give a degree of aid to those who do." *Id.,* at 176 (emphasis added). The Court described civil law "aiding and abetting" as "'know[ing] that *the other's conduct constitutes a breach of duty* and giv[ing] substantial assistance or encouragement to the other . . . .'" *Id.,* at 181 (quoting Restatement (Second) of Torts §876(b) (1977); emphasis added). And it reviewed a Court of Appeals decision that had defined the elements of aiding and abetting as "(1) *a primary violation* of §10(b); (2) recklessness by the aider and abettor as to the existence of the primary violation; and (3) *substantial assistance given to the primary violator* by the aider and abettor." 511 U. S., at 168 (emphasis added). Faced with this question, the Court answered that §10(b) and Rule 10b–5 do not provide for this kind of "aiding and abetting" liability in private suits.

By way of contrast, the present case is about *primary* liability—about individuals who allegedly themselves "make" materially false statements, not about those who help *others* to do so. The question is whether Janus Management is *primarily* liable for violating the Act, not whether it simply helped others violate the Act. The *Central Bank* defendant concededly did *not* make the false statements in question (others did), while here the defendants allegedly *did* make those statements. And a rule (the majority's rule) absolving those who allegedly *did* make false statements does not "follow from" a rule (*Cen-*

*tral Bank*'s rule) absolving those who concededly did *not* do so.

The majority adds that to interpret the word "make" as including those "without ultimate control over the content of a statement" would "substantially undermine" *Central Bank*'s holding. *Ante*, at 7. Would it? The Court in *Central Bank* specifically wrote that its holding did

> "not mean that secondary actors in the securities markets are always free from liability under the securities Acts. *Any person or entity, including a lawyer, accountant, or bank, who* employs a manipulative device or *makes a material misstatement* (or omission) on which a purchaser or seller of securities relies *may be liable as a primary violator under 10b–5,* assuming *all* of the requirements for primary liability under Rule 10b–5 are met." 511 U. S., at 191 (some emphasis added).

Thus, as far as *Central Bank* is concerned, depending upon the circumstances, board members, senior firm officials, officials tasked to develop a marketing document, large investors, or others (taken together or separately) all might "make" materially false statements subjecting themselves to primary liability. The majority's rule does not protect, it *extends*, *Central Bank*'s holding of no-liability into new territory that *Central Bank* explicitly placed outside that holding. And by ignoring the language in which *Central Bank* did so, the majority's rule itself undermines *Central Bank*. Where is the legal support for the majority's "draw[ing] a clean line," *ante*, at 7, n. 6, that so seriously conflicts with *Central Bank?* Indeed, where is the legal support for the majority's suggestion that plaintiffs must show some kind of "attribution" of a statement to a defendant, *ante*, at 11, n. 11—if it means plaintiffs must show, not only that the defendant "ma[d]e" the statement, but something more?

The majority also refers to *Stoneridge,* but that case offers it no help. In *Stoneridge*, firms that supplied electronic equipment to a cable television company agreed with the cable television company to enter into a series of fraudulent sales and purchases, for example, a sale at an unusually high price, thereby providing funds which the suppliers would use to buy advertising from the cable television company. These arrangements enabled the cable television company to fool its accountants (and ultimately the public) into believing that it had more revenue (for example, advertising revenue) than it really had. As part of the agreement, the companies exchanged letters and backdated contracts to conceal the fraud. Investors subsequently sued the cable television company, some of its officers, its auditors, and the equipment suppliers, as well, claiming that all of them had engaged in a scheme to defraud securities purchasers. In respect to most of the defendants, investors identified allegedly materially false statements contained in the cable television company's financial statements or similar documents. But in respect to the equipment suppliers, investors claimed that the relevant deceptive conduct was in the letters, backdated contracts, and related oral conversations about the scheme. The investors argued that the equipment suppliers, "by participating in the transactions," violated §10(b) and Rule 10b–5. *Stoneridge*, 552 U. S., at 155.

The Court held that the equipment suppliers could not be found liable for securities fraud in a private suit under §10(b). But in doing so, it did not deny that the equipment suppliers *had made* the false statements contained in the letters, contracts, and conversations. See *id.,* at 158–159. Rather, the Court said the issue in the case was whether "any deceptive statement or act respondents made was not actionable because it did not have the requisite *proximate relation* to the investors' harm." *Ibid.* (emphasis added).

And it held that these deceptive statements or actions could not provide a basis for liability because the investors could not prove sufficient *reliance* upon the particular false statements that the equipment suppliers had made.

The Court pointed out that the equipment suppliers "had no duty to disclose; and their deceptive acts were not communicated to the public." *Id.,* at 159. And the Court went on to say that "as a result," the investors "cannot show reliance upon any" of the equipment suppliers' actions, "except in an indirect chain that we find too remote for liability." *Ibid.* The Court concluded,

> "[the equipment suppliers'] deceptive acts, which were not disclosed to the investing public, are too remote to satisfy the requirement of reliance. It was [the cable company], not [the equipment suppliers], that misled its auditor and filed fraudulent financial statements; nothing [the equipment suppliers] did made it necessary or inevitable for [the cable company] to record the transactions as it did." *Id.,* at 161.

Insofar as the equipment suppliers' conduct was at issue, the fraudulent "arrangement . . . took place in the marketplace for goods and services, not in the investment sphere." *Id.,* at 166.

It is difficult for me to see how *Stoneridge* "support[s]" the majority's rule. *Ante,* at 7. No one in *Stoneridge* disputed the *making* of the relevant statements, the fraudulent contracts and the like. And no one in *Stoneridge* contended that the equipment suppliers were, in fact, the *makers* of the cable company's misstatements. Rather, *Stoneridge* was concerned with whether the equipment suppliers' *separate* statements were sufficiently disclosed in the securities marketplace so as to be the basis for investor reliance. They were not. But this is a different inquiry than whether statements acknowledged to have been disclosed in the securities marketplace and

ripe for reliance can be said to have been "ma[d]e" by one or another actor. How then does *Stoneridge* support the majority's new rule?

The majority adds that its rule is necessary to avoid "a theory of liability similar to—but broader in application than"—§20(a)'s liability, for "'[e]very person who, directly or indirectly, controls any person liable'" for violations of the securities laws. *Ante*, at 10 (quoting 15 U. S. C. A. §78t(a) (Feb. 2011 Supp.)). But that is not so. This Court has explained that the possibility of an express remedy under the securities laws does not preclude a claim under §10(b). *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 388 (1983).

More importantly, a person who is liable under §20(a) controls another *"person" who is "liable"* for a securities violation. *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. \_\_\_, \_\_\_, n. 2 (2010) (slip op., at 3, n. 2) ("Liability under §20(a) is obviously derivative of liability under some other provision of the Exchange Act"). We here examine whether a person is primarily liable whether they do, or they do not, control another person *who is liable*. That is to say, here, the liability of some "other person" is not at issue.

And there is at least one significant category of cases that §10(b) may address that derivative forms of liability, such as under §20(a), cannot, namely, cases in which one actor exploits another as an innocent intermediary for its misstatements. Here, it may well be that the Fund's board of trustees knew nothing about the falsity of the prospectuses. See, *e.g., In re Lammert*, Release No. 348, 93 S. E. C. Docket 5676, 5700 (2008) (Janus Management was aware of market timing in the Janus Fund no later than 2002, but "[t]his knowledge was never shared with the Board"). And if so, §20(a) would not apply.

The possibility of guilty management and innocent board is the 13th stroke of the new rule's clock. What is to

happen when guilty management writes a prospectus (for the board) containing materially false statements and fools both board and public into believing they are true? Apparently under the majority's rule, in such circumstances *no one* could be found to have "ma[d]e" a materially false statement—even though under the common law the managers would likely have been guilty or liable (in analogous circumstances) for doing so as *principals* (and not as aiders and abettors). See, *e.g.,* 2 W. LaFave, Substantive Criminal Law §13.1(a) (2d ed. 2003); 1 M. Hale, Pleas of the Crown 617 (1736); Perkins, Parties to Crime, 89 U. Pa. L. Rev. 581, 583 (1941) (one is guilty as a principal when one uses an innocent third party to commit a crime); Restatement (Second) of Torts §533 (1976). Cf. *United States* v. *Giles*, 300 U. S. 41, 48–49 (1937).

Indeed, under the majority's rule it seems unlikely that the SEC itself in such circumstances could exercise the authority Congress has granted it to pursue primary violators who "make" false statements or the authority that Congress has specifically provided to prosecute aiders and abettors to securities violations. See §104, 109 Stat. 757 (codified at 15 U. S. C. A. §78t(e) (Feb. 2011 Supp.)) (granting SEC authority to prosecute aiders and abettors). That is because the managers, not having "ma[d]e" the statement, would not be liable as principals and there would be no other primary violator they might have tried to "aid" or "abet." *Ibid.; SEC* v. *DiBella*, 587 F. 3d 553, 566 (CA2 2009) (prosecution for aiding and abetting requires primary violation to which offender gave "substantial assistance" (internal quotation marks omitted)).

If the majority believes, as its footnote hints, that §20(b) could provide a basis for liability in this case, *ante,* at 10, n. 10, then it should remand the case for possible amendment of the complaint. "There is a dearth of authority construing Section 20(b)," which has been thought largely

"superfluous in 10b–5 cases."  5B A. Jacobs, Disclosure and Remedies Under the Securities Law §11–8, p. 11–72 (2011).  Hence respondent, who reasonably thought that it referred to the proper securities law provision, is faultless for failing to mention §20(b) as well.

In sum, I can find nothing in §10(b) or in Rule 10b–5, its language, its history, or in precedent suggesting that Congress, in enacting the securities laws, intended a loophole of the kind that the majority's rule may well create.

## II

Rejecting the majority's rule, of course, does not decide the question before us.  We must still determine whether, in light of the complaint's allegations, Janus Management could have "ma[d]e" the false statements in the prospectuses at issue.  In my view, the answer to this question is "Yes."  The specific relationships alleged among Janus Management, the Janus Fund, and the prospectus statements warrant the conclusion that Janus Management did "make" those statements.

In part, my conclusion reflects the fact that this Court and lower courts have made clear that at least *sometimes* corporate officials and others can be held liable under Rule 10b–5 for having "ma[d]e" a materially false statement even when that statement appears in a document (or is made by a third person) that the officials do not legally control.  In *Herman & MacLean*, for example, this Court pointed out that "certain individuals who play a part in preparing the registration statement," including corporate officers, lawyers, and accountants, may be primarily liable even where "they are not named as having prepared or certified" the registration statement.  459 U. S., at 386, n. 22.  And as I have already pointed out, this Court wrote in *Central Bank* that a "lawyer, accountant, or bank, who . . . makes a material misstatement (or omission) on which a

purchaser or seller of securities relies *may be liable as a primary violator under 10b–5*, assuming *all* of the requirements for primary liability under Rule 10b–5 are met." 511 U. S., at 191 (some emphasis added).

Given the statements in our opinions, it is not surprising that lower courts have found primary liability for actors without "ultimate authority" over issued statements. One court, for example, concluded that an accountant could be primarily liable for having "ma[d]e" false statements, where he issued fraudulent opinion and certification letters reproduced in prospectuses, annual reports, and other corporate materials for which he was not ultimately responsible. *Anixter* v. *Home-Stake Production Co.*, 77 F. 3d 1215, 1225–1227 (CA10 1996). In a later case postdating *Stoneridge*, that court reaffirmed that an outside consultant could be primarily liable for having "ma[d]e" false statements, where he drafted fraudulent quarterly and annual filing statements later reviewed and certified by the firm's auditor, officers, and counsel. *SEC* v. *Wolfson*, 539 F. 3d 1249, 1261 (CA10 2008). And another court found that a corporation's chief financial officer could be held primarily liable as having "ma[d]e" misstatements that appeared in a form 10–K that she prepared but did not sign or file. *McConville* v. *SEC*, 465 F. 3d 780, 787 (CA7 2006).

One can also easily find lower court cases explaining that corporate officials may be liable for having "ma[d]e" false statements where those officials use innocent persons as conduits through which the false statements reach the public (without necessarily attributing the false statements to the officials). See, *e.g., In re Navarre Corp. Securities Litigation*, 299 F. 3d 735, 743 (CA8 2002) (liability may be premised on use of analysts as a conduit to communicate false statements to market); *In re Cabletron Systems, Inc.*, 311 F. 3d 11, 38 (CA1 2002) (rejecting a test requiring legal "control" over third parties making state-

ments as giving "company officials too much leeway to commit fraud on the market by using analysts as their mouthpieces" (internal quotation marks omitted)); *Novak* v. *Kasaks*, 216 F. 3d 300, 314–315 (CA2 2000); *Cooper* v. *Pickett*, 137 F. 3d 616, 624 (CA9 1997); *Freeland* v. *Iridium World Communications, Ltd.*, 545 F. Supp. 2d 59, 75–76 (DC 2008).

My conclusion also reflects the particular circumstances that the complaint alleges. The complaint states that "Janus Management, as investment advisor to the funds, is responsible for the day-to-day management of its investment portfolio and other business affairs of the funds. Janus Management furnishes advice and recommendations concerning the funds' investments, as well as administrative, compliance and accounting services for the funds." Complaint ¶18, App. to Pet. for Cert. 65a. Each of the Fund's 17 officers was a vice president of Janus Management. App. 250a–258a. The Fund has "no assets separate and apart from those they hold for shareholders." *In re Mutual Funds Inv. Litigation*, 384 F. Supp. 2d 845, 853, n. 3 (Md. 2005). Janus Management disseminated the fund prospectuses through its parent company's Web site. Complaint ¶38, App. to Pet. for Cert. 72a. Janus Management employees drafted and reviewed the Fund prospectuses, including language about "market timing." Complaint ¶31, *id.*, at 69a; *In re Mutual Funds Inv. Litigation*, 590 F. Supp. 2d 741, 747 (Md. 2008). And Janus Management may well have kept the trustees in the dark about the true "market timing" facts. Complaint ¶51, App. to Pet. for Cert. 80a; *In re Lammert*, 93 S. E. C. Docket, at 5700.

Given these circumstances, as long as some managers, sometimes, can be held to have "ma[d]e" a materially false statement, Janus Management can be held to have done so on the facts alleged here. The relationship between Janus Management and the Fund could hardly have been

closer. Janus Management's involvement in preparing and writing the relevant statements could hardly have been greater. And there is a serious suggestion that the board itself knew little or nothing about the falsity of what was said. See *supra*, at 9, 13. Unless we adopt a formal rule (as the majority here has done) that would arbitrarily exclude from the scope of the word "make" those who manage a firm—even when those managers perpetrate a fraud through an unknowing intermediary—the management company at issue here falls within that scope. We should hold the allegations in the complaint in this respect legally sufficient.

With respect, I dissent.